c:\larrica\Mihailovich\Verified Complaint

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
ST. MICHAEL ENTERPRISES, LLC and WALTER      Docket No.
MIHAILOVICH,                                 09-cv-05147(SLT)(MDG)


                          Plaintiffs,        Index No. 17820/2009


     -against-
                                             **VERIFIED COMPLAINT**

SERBIA MINISTRY OF PRIVATIZATION AND
ITS PRIVATIZATION AGENCY; ALEXANDER
VLAHOVIC, MINISTER OF PRIVATIZATION;
SINISA MALI, ASSISTANT TO THE MINISTER
OF PRIVATIZATION; KATARINA TONCIC;
DANKO DJUNIC; RAIFEISSEN ZENTRAL BANK
and RAIFEISSEN INVESTMENT,

                          Defendants.
---------------------------------------X

     Plaintiffs, ST. MICHAEL ENTERPRISES, LLC and WALTER

MIHAILOVICH, by their attorneys, Giaimo Associates, LLP, as and

for their verified complaint herein, allege upon information and

belief as follows.

<u>PARTIES</u>

     1.   At all times hereinafter mentioned plaintiff St.

Michael Enterprises, LLC is and was a limited liability company

duly organized and existing under and by virtue of the laws of

the State of Florida with a principal office in the County of

Queens, State of New York and the successor in interest to St.

Michael Enterprises d.o.o. a Limited Liability Company which was

1

duly organized and dissolved under the special laws of the sovereign nation of Serbia (hereinafter collectively "SME").

2.    At all times hereinafter mentioned plaintiff Walter Mihailovich ("Mihailovich") is and was a resident of the State of Florida and a principal of SME.

3.    At all times hereinafter mentioned defendant Serbia Privatization ("PA") is and was a state owned Agency under the Minister of Privatization of the sovereign nation of Serbia ("Serbia") with a principal office at Terazije 23/VI, 11000 Belgrade, Serbia.

4.    At all times hereinafter mentioned Alexander Vlahovic is and was the former Minister of the PA (hereinafter sometimes "Vlahovic" or "Minister" as the context requires) and a citizen and resident of Serbia.  The action against Vlahovic individually has been withdrawn.

5.    At all times hereinafter mentioned Sinisa Mali ("Mali") is and was an assistant to the Director of the PA, an employee of the PA and a citizen and resident of Serbia.  The action against Mali has been withdrawn.

6.    At all times hereinafter mentioned defendant Katarina Toncic ("Toncic") is and was an assistant to the Director of the PA and an employee of the PA who negotiated all of the terms of

the contract hereinafter referred to, and a citizen and resident of Serbia.

7.  At all times hereinafter mentioned Danko Djunic ("Djunic") is and was an employee of an advisor and consultant to the PA and a citizen and resident of Serbia.  The action against Djunic has been withdrawn.

8.  At all times hereinafter mentioned Predrag Bubalo ("Bubalo") was a former Minister of Privatization who succeeded Vlahovic as Minister.

9.  Mirko Cvetkovic ("Director" or "Cvetkovic" as the context requires) was the former Director of PA and an employee of the PA and citizen and resident of Serbia.

10.  At all times hereinafter mentioned defendants Raifeissen Investment is and was an investment institution and a division of the Bank of Austria with an office for the conduct of business in the City of Austria in the sovereign nation of Romania and an office in the City, County and State of New York.

11.  At all times hereinafter mentioned Raifeissen Zentral Bank is a banking institution and a division of the Bank of Austria with an office for the conduct of business in the City of Belgrade in the sovereign nation of Serbia and an office in the City, county and State of New York.

12.  At all times hereinafter mentioned the PA is and was the central operative instrumentality for the concept of privatization in Serbia, and is responsible for authorizing, organizing, implementing and controlling the procedures of privatization. Its status, activity, administration, organization, management and financing are defined, accordingly.

13.  At all times hereinafter mentioned Jelen Do ("Jelen Do") was a company owned by the sovereign nation of Serbia engaged in the production of building materials including limestone products and the owner of a lime quarry and production facility in Jelen Do, Serbia.

## STATEMENT OF CLAIMS

14.  In or about September 16, 2002 the PA announced a public invitation to offer to sell 70 percent of Jelen Do (collectively "Jelen Do"), offering interested firms an opportunity to tender a bid for such purchase in accordance with Serbia's privatization process.

15.  At all times hereinafter mentioned Raifeissen Investment (sometimes referred to as "Raifeissen") was the advisor, consultant to and alter ego of the PA for the privatization of Jelen Do (the PA, Toncic and Raifeissen are collectively referred to as the PA).

4

16.   On or about May 9, 2003 the PA notified SME that it had the winning tender, known as (tender Code JEL 06/02) for the purchase of Jelen Do according to Articles 16 and 18 of the Decree Concerning Sale and Capital Assets by Public Tendering of Serbia.

17.   As heretofore stated, SME was an LLC registered in Serbia as a foreign firm with 100 percent foreign capital as provided by Serbian Law located at Cetinjska 3, Belgrade, Serbia 11000 and was 100 percent American owned by Mihailovich.  SME and Mihailovich are hereinafter collectively referred to as SME.

18.   Thereafter, the PA invited the representatives of SME to commence negotiations for the Sale and Purchase Agreement, (the "contract"), at the offices at the Privatization Agency at Terazije 23, Belgrade, Serbia.

19.   Thereafter, on or about June 9, 2003, at a formal ceremony the PA as seller presented to SME as the buyer a final version of the negotiated contract, one written in Serbian and one in English, neither of which had been previously seen by SME. The English and Serbian language versions of the contract provided that the English version would apply in the event of any discrepancies between the two versions of the contract.  A copy of the contract in the English is annexed hereto as Exhibit "A"

and made a part hereof to which this Court is referred for the full force, tenor and effect thereof.

20.  By reason of the fact that there was a formal signing ceremony, SME was given limited time by the PA to read both versions of the contract, but SME was instructed by the PA to review the contract to determine whether there any major discrepancies between the two versions.

21.  Upon review by SME several errors were noted which were brought to the attention of the PA which assured SME that there would be ample opportunity at a later date to correct those errors in the contract.

22.  SME justifiably relied upon such representation by the PA and on June 9, 2003, SME signed the contract with the PA for the purchase of Jelen Do.

23.  Thereafter, SME presented to the PA a list of substantial errors in the contract that required correction, and, in particular, the language in two versions of the contract relating to payment by SME for the performance bond and the bid bond which SME was required to post.

24.  As a foreign firm SME was required to deposit a foreign currency bid bond in the amount of one hundred fifty thousand ($150,000.00) dollars to guarantee full execution of the

contract, i.e., guaranteeing SME's negotiation, payment of purchase price and deposit of the performance bond.

25.  A significant error as to payment therefor was that the executed contract provided payment of the bid bond in local currency viz. dinars, not American dollars and gave the PA the right to call a dinar-denominated bond of a specified amount, rather American dollars to be deposited with Raifeissen Bank for its bid bond.

26.  SME thereafter attempted to cause the PA to correct the contract errors but, the PA refused to do so, notwithstanding that the PA acknowledged the urgency of making the correction.

27.  Because the contract required SME to deposit both the Jelen Do purchase price of three million seven hundred thousand ($3,700,000.00) dollars and the eleven million five hundred thousand ($11,500,000.00) dollars performance bond which involved a bank guarantee, and not the payment of cash, no later than July 7, 2003 SME demanded that the PA first correct the contract errors because SME did not want to deposit the $11.7 million performance bond until PA clarified the rights it had to the performance bond and otherwise correct errors in the contract.

28.  Because the PA refused to make the corrections before SME made the required payments, SME formally solicited the U.S. Embassy to intervene and requested the PA to extend the July 7,

2003 deadline by twenty (20) days in order to return to SME the same amount of time SME lost during the period that the PA was unresponsive, i.e., from the time SME signed the contract on June 9, 2003 to the time SME sought U.S. Embassy intervention.

29.   By reason of the intervention by the U.S. Embassy the PA requested SME on July 1, 2003 to formally request an extension time in writing and notify the PA in writing of the errors which required correction along with a proposal for correction.

30.   In addition thereto the PA represented to SME that once it received the information from SME it would schedule a meeting to review the suggested corrections.

31.   As directed by the PA, SME forwarded the requested written material via courier to the PA by the end of business on July 1, 2003.

32.   The next day, July 2, 2003, the PA and SME scheduled a meeting for Thursday, July 3, 2003 to review the proposed corrections.

33.   At the meeting on July 3, 2003 between SME and the PA at which the PA reviewed each error and omission in the contract and the method for correcting the mistakes, the PA Director, Cvetkovic, informed SME that the final approval for all changes along with the requested extension must be made by the Minister of Privatization, Vlahovic.

34.  Because a major error in the contract, amongst others, related to the eleven million five hundred thousand ($11,500,000.00) dollar performance bond, SME purposed as a good faith measure that it would wire the three million seven hundred thousand ($3,700,000.00) dollar purchase price to meet the July 7, 2003 deadline.

35.  Notwithstanding that the PA represented to the U.S. Embassy that it had extended SME's time to perform, the PA refused to permit SME to wire the three million seven hundred thousand ($3,700,000.00) dollars from SME's bank contending that SME was not allowed to partially perform, and that it should either fully perform or pay the three million seven hundred ($3,700,000.00) dollars and in addition deposit the eleven million five hundred thousand ($11,500,000.00) dollar performance bond if the PA granted the extension the following day.

36.  On Friday, July 4, 2003 at the request of SME, the U.S. Ambassador stated to SME in the presence of the PA Director that its intervention was successful and the PA thereupon confirmed to SME that it would receive the twenty (20) day extension and that the PA would call SME on Monday, July 7, 2003 to arrange a time to meet and add an amendment to the contract that would reflect all of the necessary changes to the contract.

37.   On July 7, 2003, the PA informed SME that over the weekend Minister Vlahovic, members of the PA and its alter ego Raifeissen Investment who controlled the Tender Committee for the contract bid had discussed SME's request for a twenty (20) day extension and had decided that they would reconvene the Tender Committee which had already been disbanded to decide whether to grant an extension to confirm the extension and then again be disbanded.

38.   On July 7, 2003, the PA Director, who had on July 4, 2003 represented to SME that it would receive a twenty (20) day extension, informed SME that the disbanded five member Tender Committee reconvened over the weekend and voted 3 to 2 against granting to SME the extension to conform the contract.  The Director stated that Barjektarvoic; Tanaskovic; and Miljko Radovic ("Radovic") had voted against the extension and Cvetkovic and Minister Sumarac ("Sumarac") voted for the extension.

39.   Thereafter, on July 7, 2003, the Tender Committee gave SME until the end of the day to convince one of the three majority members of the Tender Committee to change his or her vote.

40.   SME thereafter contacted Barjektarovic who refused to sign the PA form of proof of change of vote; Tanaskovic who

solicited a bribe from SME, which it immediately reported to the
U.S. Embassy, SME could not reach Radovic.

41.  As hereinafter fully described, SME learned in or about
late July 2005 that Radovic gave a signed statement in the
presence of Bubalo, the Minister of Privatization, who succeeded
Vlahovic, confirming that the PA had perpetrated a fraud against
SME; that no meeting of the Tender Committee ever took place over
that July 4, 2003 weekend or any other time; and that Radovic
never voted against an extension.

42.  Because of the SME's inability to reach Radovic on July
7, 2003 to learn of the fraud the midnight deadline passed and
SME was not able to reverse the alleged 3 to 2 vote against the
extension of time.

43.  On July 9, 2003 the PA notified SME by mail that it was
in default of the contract and that the PA had the right to call
SME's bid bond as specified in the contract.

44.  On or about July 9, 2003 SME informed Raifeissen
Zentral Bank which held the SME's one hundred fifty thousand
($150,000.00) dollar denominated bid bond for Jelen Do, that the
contract did not allow the PA to call the one hundred fifty
thousand ($150,000.00) dollar bid bond and that the PA's only
right was to a bid bond denominated in Serbian dinars for which

SME had no such bond on deposit with Raiffeissen Zentral Bank for the benefit of the PA.

45.   SME thereupon notified the PA that it intended to appeal and pursue its rights to complete the contract.

46.   Thereafter, on or about July 14, 2003 the PA met with SME at which the representative contacted Vlahovic who proposed that SME refrain from pursuing Jelen Do in exchange for replacing Jelen Do with another Serbian company being sold in an upcoming tender by the PA which was refused by SME.

47.   Vlahovic thereupon informed SME that its Jelen Do appeal was denied and the one hundred fifty thousand ($150,000.00) dollar bid bond would be called.

48.   On or about July 14, 2003 Raifeissen Zentral Bank informed SME that it had received from the PA a formal request for the bond and on or about July 17, 2003 Raifeissen Zentral Bank wrongly paid SME's bid bond of one hundred fifty ($150,000.00) dollars to the PA.

49.   Thereafter, on or about March 2004, Vlahovic was replaced at the PA by Minister Bubalo and Toncic was fired for "unprofessional conduct."

50.   In or about early summer of 2005 SME met Radovic and after asking him to confirm that there was a meeting and a 3 to 2 vote against the extension on July 4, 2003, SME was informed by

Radovic for the first time that no such meeting had taken place
and that the PA committed a fraud upon SME and that the twenty
(20) day extension of time would have been approved.

51.   On or about July 19, 2005 in the office and in the
presence of Bubalo the new Minister of the PA, Radovic signed a
statement confirming the fraud committed upon SME, in which
Radovic stated that on July 7, 2003 the PA Director spoke to
Radovic and explained that he needed to reconvene the Tender
Committee in order to vote on whether to give SME a twenty (20)
day extension; that Radovic had explained at the time that he
could not return to Belgrade until later in the week; that the
Director then asked Radovic to vote over the telephone; that
Radovic explained that he had no intention of voting until the
Tender Committee was reconvened together in an official session
with appropriate time for discussion and arguments and within
minutes taken of the meeting as required by law.

52.   Radovic further stated that on Monday, July 7, 2003 the
PA Director and Toncic who was the PA official responsible for
the Jelen Do tender, harassed him with phone calls insisting that
he vote; that he made it clear that he would not vote and
demanded that the PA follow procedures and call a meeting where
all the members could be in attendance to debate the issue,
reminding the PA that a vote which did not follow the prescribed

13

procedures would be null and void under law, and that minutes needed to be taken with all members reviewing the minutes and signing the minutes before they are filed with the Ministry of Privatization.

53.  Radovic further stated that the PA director and Toncic thereupon intensified their pressure on him "not just to vote, but to vote against the extension," however, Radovic refused to do so.

54.  Thereafter, in July 2005 SME again met with Bubalo who informed SME that he reviewed the Jelen Do file and discovered that a meeting had not been held as the PA claimed; that no minutes were taken, and therefore, none of the members of the Tender Committee signed the minutes to verify their accuracy as required by law.

55.  Thereafter, on or about July 19, 2005 Radovic signed the following statement:

> I was the general manager of Jelen do, at the time of the Jelen Do Tender.  As a result, I was also a member of the Tender Committee overseeing the tender.
>
> SME won the tender.
>
> By law, once all the bids were processed, the bid rankings submitted which permitted the buyer to sign the contract--the Tender Commission was dissolved.
>
> However, in the case of Jelen Do, the Director of the Agency for Privatization, Mr.

14

Mirko Cvetkovic, attempted to call back the Tender Committee to vote on whether SME should be given an extension of time to produce the required performance bond.

I received a call from Mr. Cvetkovic, on Saturday, July 8, 2003 asking me to vote on the telephone. I told Mr. Cvetkovic that I had no intention of voting (on the phone). Rather, since I was in my car and on a business trip, I insisted that he call a meeting to discuss the matter. He refused. Mr. Cvetkovic along with Ms. Katarina Toncic, then began a campaign to barrage me with phone calls pressuring me not only to vote but to vote against the extension. I made it perfectly clear to them that I would not vote.

On Monday, my secretary contacted me to let me know that I received a fax from the Agency on the issue of the extension. The fax was address to the members of the tender committee. The wording stated "that if I--as a member of the Tender Committee--continue to stand by my decision regarding the contract (SPA) with SME that I should NOT sign this fax.  If I no longer stood by my decision with regards to the SPA contract selling Jelen Do to SME, then I should sing the fax and return the fax to the PA by Monday 5:00 p.m. on July 7, 2003.  Complete farce.  They knew that I could not permit myself to do what they were asking me to do--and that what they were asking me to do was complete nonsense--since I would never have voted against extending the deadline.

I had my secretary call the Agency again and tell them to call a meeting, and stop this campaign of phoning for votes against St. Michael, and stop sending the mysteriously worded faxes. I told them that I would ignore the fax.

I received a call from Ms. Toncic on Monday.

I understood that members of SME were in the
PA office and Ms. Toncic wanted to know
whether I received the fax the PA sent.  I
told her that I was not in my office, that I
had not seen the fax, and regardless that I
would not do anything with the fax---as I
stood by my position of demanding a meeting.

I learned on Tuesday, July 8, 2003 that I had
voted to not extend the deadline for St.
Michael with regards to the Jelen Do contract
(SPA).

I never voted. I protested to Mr. Cvetkovic,
but was ignored.

If this vote were done legally, I would have
voted to grant the extension to SME.

Signed,
Miljko Radovic,
July 19, 2005
ID number (licna karta)  249745

witness:

Gordana Marcinkovic

### AS AND FOR A FIRST CAUSE ACTION FOR FRAUD

56.  Plaintiffs repeat and reallege each and every

allegation set forth in paragraphs "1" through "55" hereof with

the same force and effect as though the same were fully set forth

at length herein.

57.  The representation by PA and its alter ego Raifeissen

Investment to SME that SME would be given a twenty (20) day

extension to post the dollars required by the contract in order

to permit the PA and SME to correct the mistakes in the contract,

was false when made with the knowledge of its falsity and was made maliciously, wantonly and intentionally for the purpose of causing SME not to comply with the contract.

58.   Because SME justifiably relied upon such false representation it failed to post the funds required under the contract pending the resolution of mistakes in the contract.

59.   The representation by the PA and its alter ego Raifeissen Investment that the extension of time requested by SME was denied by a vote of 3 to 2 was false when made, with the knowledge of its falsity and was made maliciously, wantonly and intentionally for the purpose of causing SME not to comply with the contract.

60.   By reason of the fraud committed by the PA and its alter ego Raifeissen Investment, Toncic and Raifeissen Zentral Bank the SME has been damaged in the sum of at least ten million five hundred thousand ($10,500,000.00) dollars plus lawful interest.

AS AND FOR A SECOND CAUSE OF ACTION FOR PUNITIAVE DAMAGES

61.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "60" hereof with the same force and effect as though the same were fully set forth at length herein.

62.   In committing the fraudulent acts as aforesaid, Defendants, the PA with the participation of Toncic and Raifeissen acted knowingly, intentionally, wantonly and maliciously, and without regard to the rights of plaintiffs and subjected plaintiffs to cruel and unjust hardship in addition to monetary loss.

63.   By reason of the foregoing, malicious and wanton conduct by defendants, plaintiffs are entitled to punitive damages in the amount of twenty millions ($20,000,000.00) dollars with costs and reasonable attorney's fees.

AS AND FOR A THIRD CAUSE ACTION FOR BREACH OF CONTRACT

64.   Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "63" hereof with the same force and effect as though the same were fully set forth at length herein.

65.   Plaintiffs have complied with each and every provision of the contract on their part to be performed and the PA and Raifeissen Investment and each of them failed and refused to comply with the provisions thereof.

66.   By reason of the foregoing breach of the contract committed by the PA and Raifeissen Investment, plaintiffs have been damaged in the amount of ten million five hundred thousand ($10,500,000.00) dollars plus lawful interest.

## AS AND FOR THE FOURTH CAUSE OF ACTION FOR CONSPIRACY

67. Plaintiffs repeat and reallege each and every allegation set forth in paragraphs "1" through "66" hereof with the same force and effect as though the same were fully set forth at length herein.

68. Defendants, the PA, Raifeissen, Raifeissen Zentral Bank and Toncic and each of them and their employees and agents conspired together with the intention to deceive and defraud the plaintiffs and to thwart plaintiff's enforcement of the contract and purchase of Jelen Do in violation of the laws of the United States and Serbia.

69. By reason of the foregoing, plaintiffs have been damaged in the sum of ten million five hundred thousand ($10,500,000.00) dollars plus lawful interest.

WHEREFORE, plaintiffs demand judgment, as follows:

(a) as to the first cause of action, damages in the amount of ten million five hundred thousand ($10,500,000.00) dollars plus lawful interest thereon; and

(b) as to the second cause of action, punitive damages in favor of plaintiffs in the sum of twenty million ($20,000,000.00) dollars; and

(c) as to the third cause of action, damages in the amount of ten million five hundred thousand ($10,500,000.00) dollars plus lawful interest; and

(d) as to the fourth cause of action, damages in the amount of ten million five hundred thousand ($10,500,000.00) dollars plus lawful interest; and

(e) for such other and further relief as this Court deems just and proper together with the costs and disbursements of this action.

Dated:    Queens, New York
          March 23, 2010

                                        _____
                                        Joseph O. Giaimo
                                        GIAIMO ASSOCIATES, LLP
                                        Attorneys for the Plaintiffs
                                        80-02 Kew Gardens Road
                                        Kew Gardens, New York 11415
                                        (718) 261-6200

VERIFICATION

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF QUEENS   )

I, the undersigned, an attorney admitted to practice before all the Courts of the State of New York, state that I am the attorney of record for the plaintiffs in the within action; I have read the Verified Complaint and the contents thereof, and the same is true to my own knowledge, except those matters therein which are stated to be alleged information and belief, and as to those matters I believe it to be true.  My belief as to those matters therein not stated upon knowledge is based upon a review of the file and conversation with the plaintiffs.

The reason I make this verification instead of plaintiffs is that plaintiffs were not in the County of Queens at the time this verification is made.

I affirm that the foregoing statements are true under penalties of perjury.


Dated:  Queens, New York
        March 23, 2010




                                                JOSEPH O. GIAIMO

21